UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2014 MAR 17  AM 11: 50

UNITED STATES OF AMERICA

v.                      Case No.    3:14-cr-42-J-39JBT
                             Ct. 1:       18 U.S.C. §§ 1349 & 1343
GLEN ELLIOTT SMITH      Forfeiture:  18 U.S.C. § 981(a)(1)(C) &
                                                    28 U.S.C. § 2461(c)

**INFORMATION**

The United States Attorney charges:

**COUNT ONE**
**(CONSPIRACY TO COMMIT WIRE FRAUD)**

Between in or about early November 2009, through on or about February 8, 2010, in the Middle District of Florida, and elsewhere,

GLEN ELLIOTT SMITH,

the defendant herein, did knowingly and willfully combine, conspire, confederate and agree with others, known and unknown, to devise and intend to devise a scheme and artifice to defraud, and for obtaining money by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Sections 1349 and 1343.

At all times material,

## BACKGROUND

1.   The defendant, GLEN ELLIOTT SMITH (SMITH), was a resident of the State of Louisiana.

2.   SMITH had no relevant investment training or experience in international investment markets.   SMITH was affiliated with Cole's Cash Flow Specialists, LLC to facilitate his role in procuring G.Y.S.'s investment into the high yield investment CD.

3.   Christopher JAIJAIRAM (JAIJAIRAM) had no relevant investment training or experience in international investment markets.

4.   JAIJAIRAM incorporated CJ Group Services, Inc., in New York, as an entity to assist JAIJAIRAM in facilitating his role in procuring and purportedly furthering victim G.Y.S.'s investment into a nonexistent $200,000,000 leased Certificate of Deposit (CD) (the high yield investment CD), which was purportedly secured by a New Zealand bank named U.S.L.   JAIJAIRAM held himself out as the United States representative for U.S.L., and further represented that JAIJAIRAM worked for an individual known as J.H., who JAIJAIRAM never met in person.

5.   U.S.L. was a fictitious banking entity and shell corporation that transacted no legitimate banking business in New Zealand.

6.   J.H. held himself out as a principal of the fictitious banking entity U.S.L.

7. M.H. was the principal of V.F., an entity incorporated in Florida with addresses in California and Florida, which purportedly facilitated significant international investments, such as the high yield investment CD, and other purportedly high yield investments.

8. W.R. was the sole principal of A.C., a Texas corporation. W.R. had a working relationship with M.H. and V.F., but had never met M.H. in person. Their working relationship was solely via e-mail and wire communication.

9. Rondell Scott HEDRICK (HEDRICK) was a resident of the state of North Carolina. HEDRICK incorporated Hedrick Consulting, Inc. to further HEDRICK's ability to further fraudulent investments, such as G.Y.S.'s purported investment into the high yield investment CD. HEDRICK partnered with M.H. and V.F. to procure and further fraudulent investments. HEDRICK never met M.H. in person. Their relationship was entirely based upon e-mail and wire communication. HEDRICK had no relevant investment training or experience.

10. The victim in this fraudulent scheme is G.Y.S., a Jacksonville, Florida businessman in the construction industry.

11. After corresponding with other individuals, the victim, G.Y.S., was referred to M.H. at V.F. and HEDRICK to participate in a fictitious international banking investment explained to G.Y.S. as the leasing of a $200,000,000 CD (hereinafter "the high yield CD investment"), which could be monetized and traded in a platform trading program only available for such significant assets. Based on false and fraudulent representations and promises, G.Y.S. agreed to make an

initial payment of $622,500 via wire transfer to Commercial Escrow Services to initiate the leasing of the high yield investment CD.   Based on false and fraudulent representations and promises, G.Y.S. understood that the initial $622,500 investment, which G.Y.S. wired to Commercial Escrow Services on or about November 4, 2009, would permit G.Y.S. access to the high yield investment CD to invest it in special international trading programs or obtain advanced funds, which would net the capital required for G.Y.S. to pay the 7% fee of $14,000,000 due to U.S.L. within sixty (60) days of the initial leasing of the high yield investment CD.

12.   The Depository Trust and Clearing Corporation (D.T.C.C.) is a private yet highly regulated entity that operates as a clearinghouse that standardizes the post-trade processing of financial transactions for institutions involved in global trading markets.

13.   A Committee on Uniform Securities Identification Procedures (CUSIP) number is an identification number assigned to securities, including stocks and registered bonds, which specifically identifies each security.   A CUSIP number is specific to an individual stock or bond.   The same CUSIP number cannot identify two different securities.

## MANNER AND MEANS

1.   It was part of the conspiracy that in or about November 2009, G.Y.S. was introduced to an individual named M.H., the principal of V.F.   M.H. falsely represented to G.Y.S. that M.H. could access and facilitate G.Y.S.'s investment into the high yield CD investment.

2. It was further part of the conspiracy that in early November 2009, SMITH, a representative of Cole's Cash Flow Specialists, LLC, e-mailed documents titled Account Agreement and Escrow Agreement to G.Y.S. to initiate the investment into the high yield investment CD.

3. It was further part of the conspiracy that another representative of Cole's Cash Flow Specialists, LLC, referred G.Y.S. to HEDRICK, who incorporated Hedrick Consulting, Inc., to "monetize" the high yield investment CD, or to convert the high yield investment CD into capital that could be used and invested in special platform trading markets only available to such significant assets.

4. It was further part of the conspiracy that in early November 2009, HEDRICK made false and fraudulent representations to G.Y.S. during an in person meeting concerning HEDRICK's significant experience and success in international high yield investment markets, and what G.Y.S. could expect from the leasing of the high yield investment CD.

5. It was further part of the conspiracy that JAIJAIRAM, purportedly working as a United States representative of the fictitious U.S.L. banking entity, contacted G.Y.S. on behalf of U.S.L. executive J.H., to facilitate G.Y.S.'s investment into the high yield investment CD, and falsely represented to G.Y.S. that U.S.L. was a legitimate foreign bank involved in high yield investment CDs, and that in other similar deals when JAIJAIRAM worked with M.H. and HEDRICK, JAIJAIRAM was provided money.

6. It was further part of the conspiracy that in early November 2009, based on the false and fraudulent representations made by SMITH, M.H., HEDRICK and others, G.Y.S. wired $622,500 to Commercial Escrow Services as an initial investment into the high yield investment CD.

7. It was further part of the conspiracy that instead of any investment into the purported high yield investment CD, once G.Y.S. wired the $622,500 to Commercial Escrow Services in early November 2009, the $622,500 was transferred to various other accounts held by M.H. and V.F., SMITH, HEDRICK, U.S.L., W.R. and A.C., and JAIJAIRAM and CJ Group Services, Inc. The $622,500 was not invested into any investment.

8. It was further part of the conspiracy that JAIJAIRAM failed to perform any proper due diligence into the fidelity of the high yield investment CD, and that even though JAIJAIRAM held himself out as a representative of U.S.L. and U.S.L.'s purported executive J.H., JAIJAIRAM had never been to any U.S.L. branch or met in person with J.H. or other U.S.L. principal. JAIJAIRAM e-mailed G.Y.S. a lengthy information sheet concerning the fidelity of the high yield investment CD, when, in fact, the high yield investment CD did not exist.

9. It was further part of the conspiracy that SMITH likewise failed to perform any proper due diligence into the fidelity of the high yield CD investment, and that even though SMITH claimed to work in tandem with M.H. and V.F., SMITH had never transacted any legitimate business with V.F., or even met V.F.'s principal, M.H., in person.

10. It was further part of the conspiracy that in early November 2009, when G.Y.S. inquired into proof of his initial investment into the high yield investment CD, a representative of V.F. e-mailed G.Y.S. information on how to access the Depository Trust and Clearing Corporation (D.T.C.C.) "screen shot", which purportedly established proof of G.Y.S.'s investment into the high yield investment CD. The information was fictitious and contained a CUSIP number (an identification number assigned to securities, which allows for each security to be identified by legitimate investors), which was fictitious.

11. It was further part of the conspiracy that M.H., the principal of V.F., e-mailed the fictitious D.T.C. screen shot to G.Y.S. in early December 2009 referencing HEDRICK as the beneficiary of the high yield investment CD and indicating that the CD was issued by Chase Manhattan BWI.

12. It was further part of the conspiracy that HEDRICK (Hedrick Consulting, Inc.) was listed as the beneficiary of the high yield investment CD because HEDRICK was the individual who would purportedly "monetize" the high yield investment CD, or convert the high yield investment CD into capital, which could then be used and invested into international high yield platform trading programs.

13. It was further part of the conspiracy that M.H. and HEDRICK represented to G.Y.S., via various contractual agreements, that from the date G.Y.S. made the initial $622,500 investment and received the D.T.C. "screen shot", G.Y.S. would be able to invest the high yield investment CD into select

international trading programs for such assets or obtain advanced funds, which would allow G.Y.S. to pay the balance of the 7% fee (on the high yield investment CD) to U.S.L. by on or about January 11, 2010. M.H. and HEDRICK made false and fraudulent representations and promises that G.Y.S. could expect significant returns from the investment in leasing the high yield investment CD.

14. It was further part of the conspiracy that M.H. and HEDRICK represented to G.Y.S. that once G.Y.S. wired the initial $622,500 and then paid the balance of the 7% fee owed to U.S.L. ($14,000,000), G.Y.S. would have one calendar year during which to use the high yield investment CD in special international platform trading programs only available to such high worth assets.

15. It was further part of the conspiracy that once G.Y.S. wired the initial $622,500 to Commercial Escrow Services, it became increasingly difficult for G.Y.S. to contact HEDRICK and M.H.

16. It was further part of the conspiracy that in late December 2009 and early 2010, HEDRICK and M.H. engaged in e-mail communication with G.Y.S. offering variations to the initial investment, which would permit G.Y.S. to extend the original 60 day period that G.Y.S. had to pay the balance of the 7% fee ($14,000,000) to U.S.L. so that HEDRICK could continue to "monetize" the high yield investment CD and trade it as anticipated so that G.Y.S. would have additional time to pay the balance owed to U.S.L.

17. It was further part of the conspiracy that JAIJAIRAM sent e-mail communications to G.Y.S. in early January 2010 informing G.Y.S. that U.S.L. was extending G.Y.S.'s deadline to February 11, 2010 for G.Y.S. to provide the balance of $14,000,000 to U.S.L., so that HEDRICK could "monetize" the high yield investment CD, and thus G.Y.S.'s initial investment of $622,500 was extended an additional 30 days.

18. It was further part of the conspiracy that in early February 2010, HEDRICK and M.H. avoided communication with G.Y.S. concerning the soon to expire high yield investment CD.

19. It was further part of the conspiracy that in early February 2010, JAIJAIRAM (the purported U.S.L. representative) indicated that U.S.L. would issue a cease and desist letter to G.Y.S. because G.Y.S. had not paid the balance owed ($14,000,000) to lease the high yield investment CD, and thus G.Y.S. was not eligible for a refund of G.Y.S.'s initial $622,500 investment.

## OVERT ACTS

In furtherance of the conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Middle District of Florida and elsewhere:

1. On or about November 3, 2009, SMITH, who was affiliated with Cole's Cash Flow Specialists, LLC, e-mailed G.Y.S. an Account Agreement and Escrow Agreement for G.Y.S. to execute, which provided for G.Y.S. to wire $622,500 to Commercial Escrow Services for the benefit of V.F. and M.H.

9

2. In early November 2009, G.Y.S. met with HEDRICK, who represented, among other things, that HEDRICK (a) had significant international banking relationships; (b) could "monetize" the high yield investment CD; (c) could place the high yield investment CD into platform trading; (d) worked with similar high yield bonds much larger than $200,000,000; (e) has seen such deals pay significant returns; and (f) expected significant returns once the high yield CD investment was monetized and invested into high level platform trading.

3. On or about November 4, 2009, based upon the false and fraudulent representations of M.H., HEDRICK, and SMITH, G.Y.S. wired $622,500 from the CNL Bank branch in the Middle District of Florida to a Union Bank account for Commercial Escrow Services located in California.

4. On or about November 9, 2009, Commercial Escrow Services wired $201,431 to the Wells Fargo Bank account held by V.F.

5. On or about November 9, 2008, Commercial Escrow Services wired $78,172 to a BBVA Compass account held by Aster Capital, Inc.

6. On or about November 12, 2009, V.F. (via the same Wells Fargo Bank account) wired $131,290 to a Regions Bank account held by SMITH.

7. On or about November 13, 2009, SMITH wired $5,550 from SMITH's Regions Bank account to the SunTrust Bank account held by HEDRICK.

8. On or about November 9, 2009, Commercial Escrow Services, via the Union Bank account, wired $339,502 to U.S.L.'s Citibank Espana account.

9. On or about November 27, 2009, U.S.L., $108,632.57 was transferred into CJ Group Services' (JAIJAIRAM) Bank of America account.

10. On or about November 9, 2009, three days before SMITH was paid with a portion of G.Y.S.'s $622,500, SMITH e-mailed GYS contracts for G.Y.S. to execute with U.S.L. concerning the leasing and use of the high yield investment CD.

11. On or about November 9, 2009, HEDRICK executed the U.S.L. contract to purportedly further G.Y.S.'s investment into and use of the high yield investment CD, and sent the executed contract to M.H. at V.F.

12. On or about December 1, 2009, M.H. of V.F. e-mailed the fictitious D.T.C. "screen shot" of the purported high yield investment CD to HEDRICK (copying G.Y.S.), which purportedly named HEDRICK as the beneficiary of the high yield investment CD.

13. On or about January 17, 2010, after G.Y.S. made repeated attempts to contact M.H. and HEDRICK concerning the leasing and use of the high yield investment CD, HEDRICK e-mailed G.Y.S. (copying SMITH) concerning HEDRICK's purported ability to revive his ability to "monetize" the high yield investment CD, pay the required 7% lease fee ($14,000,000) to U.S.L., and provide G.Y.S. options to use the leased CD, which would purportedly provide G.Y.S. the previously promised capital.

14. On or about January 18, 2010, M.H. e-mailed G.Y.S. (copying HEDRICK) explaining, in substance, that, in addition to the previously achieved 30 day extension for the investment of the leased CD to cover the balance owed to further use the high yield investment CD ($14,000,000), U.S.L. agreed to extend G.Y.S.'s access to and use of the CD for a period of one year from the time of the expected lease payment of the $14,000,000, and thus that HEDRICK would be able to further "monetize" the high yield investment CD and continue efforts to use the high yield investment CD to generate promised investment returns.

15. On or about January 21, 2010, M.H. e-mailed G.Y.S. (copying HEDRICK) a "monetizing" contract and stated, in substance, that if G.Y.S. executed the contract, that cash would be available to G.Y.S., and that a net "payout" to G.Y.S. of $5,480,000 was expected in 5 to 10 banking days.

16. On or about February 8, 2010, JAIJAIRAM, the purported U.S.L. representative in the United States, informed G.Y.S. that because G.Y.S. did not provide the 7% fee ($14,000,000) to U.S.L. per the executed contracts to lease the high yield investment CD, G.Y.S. no longer had access to the high yield investment CD.

All in violation of Title 18, United States Code, Sections 1349 and 1343.

## **FORFEITURE**

1. The allegations contained in Count One of this Information are incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

2. Upon conviction of a violation of Title 18, United States Code, Sections 1349 and 1343, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

3. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A. LEE BENTLEY, III
United States Attorney

By: _____
A. TYSEN DUVA
Assistant United States Attorney

By: _____
KAREN L. GABLE
Assistant United States Attorney
Chief, Criminal Division (North)